Pratt, J.
The defendant’s interference with the plaintiff’s water rights in this case presents two phases: One, the ordinary case of flooding his land by means of flush-boards on his dam, which presents chiefly a simple question *804 of fact. The other, the withdrawal of the water from the farm under circumstances quite peculiar, but no more difficult to resolve when they are once clearly understood.
It seems that plaintiff’s farm is at the southwesterly end of Haggard’s pond, a body of water having no defined stream, which, m consequence of defendant’s dam, spreads out into a smaller pond, and these waters, thus dammed, set back through a channel which connects the two ponds. Thus the waters of Haggard’s pond have, as it were, ebbed and flowed through this channel for nearly a century according to the use or disuse of the dam on the stream.
' The plaintiff’s farm is located at the part of this Haggard pond most remote from this connecting channel. It is obvious that the natural high water mark in the stream would indicate the natural high water mark in this “setback”— the Haggard pond. It is also obvious that the natural low water mark of the stream might be lower than that of the set back, for this reason: The natural bottom of the connecting channel would control the flow of water out from this set back.
In 1845, defendant’s father, while occupying the mill privileges and riparian rights on the stream and at this channel, conceived the idea of utilizing this set back pond as a reservoir in aid of his mill pond on the stream, by dredging this connecting channel to the depth of three or four feet below its natural level. In other words, he formerly could use the waters of this set back pond only to the depth of say four feet below natural high water mark; but by means of the dredgings he secured an increased storage depth of say eight feet by lowering this natural dam—the natural bottom of the channel. In ordinarily wet seasons there would be no occasion to use the artificial part of this channel, but, in times of great drought, he would sometimes draw down the set back pond so that the land at plaintiff’s end of the pond would be laid bare. On such occasions plaintiff’s father demanded payment for this interference with his right to have the water of the pond on his farm, and defendant’s father conceded the wrongful interference and paid for it. Once he refused, but there was a law suit and he was made to pay for it. That was in 1881-'1882.
It is thus obvious that plaintiff’s predecessors in title, so far at least as this evidence discloses, have always insisted on the right to this water in the set back pond, to the level of the natural bottom of this connecting channel, and there is no evidence of its actual use by anybody except on these conditions. There was no injury to the farm unless the water was drawn so low that the artificial part of the channel began to operate.
The simple fact that the artificial part of the channel was there under the water, no matter when it was dredged, whether in 1845 or in 1745, had no effect on plaintiff’s rights, *805 until it was used in its distinctive capacity, to produce injury by drawing the water to a lower level than thus natural low water mark. It was as harmless as an unopened jackknife in a man’s pocket. It did no more injury to plaintiff’s father’s farm than a sunken log in plaintiff’s stream or a shovel full of earth removed from its bottom. But instantly when it began to operate so as to draw the water from the set-back pond to a level below the natural bottom of this connecting channel as nature left it, then, and not until then, did it begin to exhaust the natural body of water which the farm owner was justly entitled to keep for his own uses. It was therefore the user and not the mere existence of the artificial part of this channel of which the farm owner had the right to complain.
I have carefully examined the evidence, and find it sufficient to sustain the findings of the learned trial judge that, by means of the artificial part of the channel, the defendant, at the times indicated, improperly deprived the plaintiff of water which nature would otherwise have supplied for his stock and other purposes; and I am clear that there has never been an acquiescence in an adverse user.
The finding that the flush boards occasionally flooded plaintiff’s lands above natural high-water mark, is also sustained by sufficient evidence. It may very well be that the particular facts stated by the surveyors and engineers were not contradicted; but it is equally true that the inferences deducted from those facts were directly in conflict with inferences properly drawn from facts which old farmers and observers saw on the stones and land through their spectacles. They said that the water was higher in the pond than they had ever seen it before, and verified their observations by marks on the stones and wall about the pond. The engineers show that it ought not to have been: but the answer is, that it was higher all the same.
The findings relative to the extent of the inquiry, are also supported by the evidence.
The judgment should be affirmed, with costs.
Dykman, J., concurs Barnard, J., not sitting.